THE STATE, ON THE RELATION OF MARTIN *et al.*, Respondents, v. THOMPSON, *et al.*, Appellants.

1. The old Bank of Missouri, having accepted the provisions of the act regulating banks and banking institutions, &c. (see Sess. Acts, 1857, p. 14) established, as required by the 12th section of the 10th article of said act, a branch bank at Palmyra, in Marion county, and furnished to it a capital of

$62,500. The parent bank appointed all the directors, nine in number, there being no private subscription of stock at the time. Afterwards, books of subscription were opened at Palmyra, and $62,500 in stock were subscribed; some of these shares were forfeited and only $33,660 were paid in on the stock subscribed. The parent bank, claiming under these circumstances the right to appoint six out of the nine directors, ordered an election for the three remaining directors on the 1st of March, 1858. The directors of the branch bank also resolved that an election should be held for three directors on said day, and notice was given to that effect. An election was accordingly held and a large majority of the stockholders voted for five directors instead of three; a small minority voted for three persons as directors. The latter were declared duly elected. *Held*, 1st, that under such circumstances the parent bank was authorized, by the 15th section of the 10th chapter of said act above referred to, to appoint six of the directors, and that the private stockholders were entitled to appoint no more than three; that the furnishing of capital, within the meaning of said section, is not the subscribing of stock merely, but the payment of the same; 2d, that the election being legally an election for three directors only, the votes given for five directors were illegal and were properly disregarded, and the three directors voted for were properly declared elected.

### *Appeal from Marion Circuit Court.*

*Dryden* and *Lipscomb*, for appellants.

*Anderson*, for respondents.

SCOTT, Judge, delivered the opinion of the court.

The old Bank of Missouri, having accepted the terms proposed by the act to regulate banks and banking institutions and to create the office of bank commissioners, stood incorporated under the provisions of that act. The 12th section of the 10th chapter of this law required the mother bank to establish seven branches—one at Palmyra, in Marion county, with a capital of not more than $125,000. (Chap. 10.) In pursuance to this provision the mother bank established a branch at Palmyra and furnished it with $62,500. There being no private subscription of stock at this time, the mother bank, under the 15th section of chapter 10 of the act, appointed all the directors, numbering nine. Afterwards during the year 1857—that in which the branch was located at Palmyra—books of subscription were opened at

that place, and $62,500 were subscribed by individuals in stock. Some of these shares were afterwards forfeited for the nonpayment of calls, and $33,660 was paid in on the shares of stock subscribed. In this state of affairs, the mother bank, claiming the right to appoint six out of the nine directors to which the branch bank was entitled, and having appointed that number, ordered an election by the private stockholders for the three remaining directors on the 1st March, 1858. A controversy thereupon arose between the mother bank and the private stockholders as to the number of directors by which the mother bank on her part and the stockholders on their part should be represented in the board. The mother bank maintained that she had a right to appoint six of the nine directors, leaving three to be appointed or elected by the stockholders. The stockholders contended that they were entitled to elect five, the number to which the stockholders in all the branch banks directed to be established by the act were entitled. The directors of the branch bank passed a resolution, that, in pursuance to the order of the parent board and the notice given by the president of that branch, an election for three directors on the part of the private stockholders should be held on the first Monday in March, 1858, at the banking house. As has been observed, the members of this board were appointed by the parent bank and represented its views. In accordance with the above resolution, an election was held at the time and place appointed. At that election, those of the stockholders who sided in opinion with the mother bank voted for three directors. The stockholders who maintained their right to elect five directors voted for five accordingly. The stockholder's ticket, with five names upon it, received a great many more votes than the ticket with only three names. The average number of votes for the tickets respectively was 212 and 88. This result being reported by the judges of the election to the board, it was resolved that William H. Walker, William B. Phillips and Joseph W. Thompson, having received the largest number of legal votes, are hereby declared

duly elected directors on the part of the private stockholders for one year next ensuing, and until their successors are appointed. The individuals above named are those whose names as candidates were on the ticket supported by those who maintained that only three directors could be elected by the private stockholders. This ticket, as has been already stated, received a less number of votes than the other ticket. Upon this, the five voted for as directors and who received the greatest number of votes caused an information in the nature of a *quo warranto* to be filed against the directors who were declared to have been duly elected, in order to oust them from their offices, which it was alleged they usurped. Upon a trial, the directors declared to have been duly elected were found guilty and fined; from which judgment they appealed.

Upon this state of facts, two questions are presented; first, whether the five directors were duly elected; and, secondly, what was the number of directors to which the private stockholders were entitled.

On the part of the defendants it was contended that, under the resolution, only three candidates could be voted for; that the private stockholders, by casting their ballots for more directors than were authorized to be elected by the resolution, denied its authority, and must be regarded as having acted without right or legal power; consequently, the votes given by them were illegal and void, and could not be counted. It can not be maintained that that is an election where the electors are permitted to vote for more persons to fill the office than are allowed by law. If such a course was tolerated, after the so called election it would be necessary to hold another in order to ascertain which of the number voted for shall have the office, as they all can not hold it. If a person, entitled to vote for three representatives only, votes for five, can it be known which three of the five he intended to elect? How are the judges of the election to record such a vote? If a person is authorized to choose one agent only, and he selects five, has he made any election? As but one

only of the five can serve him, is it known which one of the five he has chosen ? The fact that some have more votes than others does not prove that they are elected over those having a less number. Confine the votes to the legal number of candidates, and the result may be altered. If the result may be affected by such a course, it can not then be said that the election is a legal one. It is not like the case where each elector votes for whom he pleases, but confines his choice to the legal number of candidates. In that case, if a plurality elects, the persons having the highest number of votes are chosen. But where more candidates are voted for than are permitted by law, the fact that some have received more votes than others does not prove that they are elected. As each elector votes for more persons than the law allows, he does not designate those whom he would have to fill the office ; and if all the electors act in the same way, can their choice of those who should fill the office be known ? The objection to the act is, that the voters have not designated the persons for whom they voted. By voting in that way the judges of the election could not ascertain for which of the number the stockholders did vote, and would properly reject all such ballots. There may be no doubt that the majority of the stockholders in interest were opposed to those declared duly elected ; but courts can only respect the will of individuals when it is embodied in the forms required by law. A candidate may receive only ten votes and be elected when there may be hundreds against him who have not expressed their voice in the way the law prescribes. As the stockholders wilfully and knowingly voted in disobedience to the resolution under which the election was held, they have no just ground of complaint. It is a matter of importance that offices should be filled ; and if electors will knowingly cast their votes in an illegal manner, they can not object that those elected by the legal votes are not the choice of the majority of those entitled to vote.

It remains to be determined to what weight the parent bank was entitled in the directory of the branch at Palmyra

in the election on the first of March, 1858. The 15th section of the 10th chapter of the act prescribes that " the president and directors of the branch banks shall be chosen in the manner required by the general law, in cases where the capital furnished by the parent bank and the stockholders at the branch bank is equal; and when the greater amount is furnished by the parent bank, the number to be elected by the parent bank shall be in the same ratio increased to a number not exceeding that allowed by the general law." It is maintained that under this section the branch bank at Palmyra, after it had subscribed an amount of stock equal to the capital furnished by the parent bank, was entitled to five, its full number of directors; that in relation to the branches of the other banks established by the act, stock subscribed is regarded as capital, and the branches, on such subscriptions alone being made, are entitled to the number of directors allowed by law; that the word " capital" should have a uniform signification throughout the act. The general provision in relation to branch banks is, that they shall have nine directors, four of whom shall be elected by the directors of the parent bank and five by the stockholders who shall have subscribed for stock at the place of the location of the branch. In regard to all the other banks than that of the State of Missouri, they are not required to establish branches until $50,000 shall have been subscribed at the place of the branch unless three-fifths of their capital stock shall have been paid in, and the requisite sum shall not have been subscribed by the branch to authorize it to begin business, and the subscriptions reserved for the branches shall have been taken by the parent bank. When a branch bank begins business, the parent bank is never required to advance to it more capital than has been paid in on its stock subscribed. Thus it is seen that the branches, while having their five out of the nine directors, are required always to furnish as much capital as the parent banks unless on the happening of the contingencies stated above. These provisions then require that the branches shall furnish as much capital as the mother

banks. The 14th section of the same chapter of the act directs that the parent bank may at any time, in its discretion, establish either or any of the seven branches, without the previous subscription of stock at the place of its location, but may withdraw the same unless an amount of stock, to be specified, shall, in the time required by the board, be subscribed and paid in by stockholders in the vicinity of the branch. This section, it will be seen, gives the bank authority to withdraw any branch established, unless a required amount of stock shall be subscribed and paid—a clear expression that it is not the subscribing of the stock alone that will enable a place to retain its branch, but the paying it in must follow the subscription in order to prevent a removal of it. The 15th section of the same chapter, which has been already copied, only preserves to the branches the number of directors to which they are entitled by the general provision concerning branches in cases where the capital furnished by the parent bank and the stockholders at the branch bank is equal; otherwise the directors are to be apportioned according to the amount furnished by the parent bank, if it exceeds the amount furnished by the branch. If the legislature intended that stock subscribed should be regarded as " capital furnished," would it by the 14th section have authorized the removal of the branch, unless stock was not only subscribed but paid in ? If the subscription of stock alone was regarded as furnishing capital, why remove the branch because it was not paid in ? In the section referred to, the word " furnished" can not be predicated of stock. Subscribing stock is not furnishing capital. Could a bank do business on its stock alone ? Certainly it was intended that the branches should furnish that with which banking transactions might be carried on. What was it to the parent bank that any amount of stock was subscribed unless it was paid in ? Was it to furnish capital to be managed by those who had no interest whatever in it ?

If the directors then were to be apportioned according to the capital furnished, it remains to determine the number to

which the parent bank and the branch were respectively enti-
tled. The parent bank furnished $62,500; then, under the
general law, the bank, being entitled to four directors, each
one of them would represent $15,625, or, in other words,
$15,625 would entitle it to a director. If the branch bank
furnished the same amount, it being entitled to five direc-
tors, each one would represent $12,500, or $12,500 would
entitle it to a director. As however it only furnished $33,-
600, it would not be entitled to three directors, $37,500 be-
ing necessary for that purpose. But adopt the more equit-
able rule, and where the fraction is more than half allow it
as a whole, and it would only be entitled to three directors.

Judgment reversed and proceeding dismissed; Judge
Napton concurring.